## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

ELIZABETH E. NICOLLS,

               Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

               Defendant.

No. C11-4065-LTS

**MEMORANDUM OPINION AND
ORDER**

### *Introduction*

The plaintiff, Elizabeth E. Nicolls, seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Nicolls contends the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that she is not disabled.

### *Background*

Nicolls was born in 1983, completed the tenth grade, and previously worked as a cashier and fast-food worker. AR 142, 148, 151. Nicolls applied for DIB on August 14, 2007, and for SSI on August 31, 2007, alleging disability beginning on April 1, 2005 (later amended to July 23, 2007), due to panic disorder and depression. AR 11, 29, 112-25, 143, 147. The Commissioner denied Nicolls's applications initially and again on reconsideration. Nicolls requested a hearing before an Administrative Law Judge ("ALJ"). AR 56-76. On February 10, 2010, ALJ Jan E. Dutton held a hearing in which Nicolls and a vocational expert ("VE") testified. AR 25-55. On

April 9, 2010, the ALJ issued a decision finding Nicolls not disabled since the alleged onset date of disability of July 23, 2007.   AR 8-20.   Nicolls sought review of this decision by the Appeals Council, which denied review on May 20, 2011.   AR 1-7.   The ALJ's decision thus became the final decision of the Commissioner.   20 C.F.R. §§ 404.981, 416.1481.

On July 21, 2011, Nicolls filed a complaint in this court seeking review of the ALJ's decision.   On August 30, 2011, with the parties' consent, United States District Judge Mark W. Bennett transferred the case to Chief United States Magistrate Judge Paul A. Zoss for final disposition and entry of judgment.   On June 8, 2012, the case was reassigned to the undersigned.   The parties have briefed the issues, and the matter is now fully submitted.

## Summary of Evidence

### A. Siouxland Mental Health Center

All medical evidence of record comes from the claimant's treatment at Siouxland Mental Health Center.   This program provides care for low income individuals. Patients are seen by a nurse practitioner or a physician assistant and a licensed therapist.   Nicolls initiated treatment with a therapist in March 2007, stating that things were happening in her life that she couldn't talk to anyone about and that they were making her depressed.   AR 320.   She also explained that she was having panic attacks, especially in stores.   *Id*.   Her first appointment with the nurse practitioner was on July 23, 2007.   AR 307.   During this visit, Karen Stoos, ARNP, diagnosed (a) adjustment disorder with mixed anxiety and depressed mood and (b) depressive disorder (not otherwise specified).   AE 308.   She indicated that panic order without agoraphobia

needed to be ruled out. *Id.* She assigned Nicolls a Global Assessment of Functioning (GAF) score of 60[1] and prescribed 10 mg Lexapro. *Id.*

Nicolls began treating with Siouxland Mental Health Center two times per month, however, she cancelled several appointments due to illness (her children's or her own), transportation, doctor appointments for her children or boyfriend, or other reasons not provided. AR 265-66, 271-72, 275, 277, 283, 286-87, 290, 292, 295-96, 328-29, 332-33, 340-43, 346, 349-53, 356-59, 362, 367. In 2008, she cancelled or did not show up to twelve appointments. In 2009, the claimant cancelled or did not show up to ten appointments. AR 356.

Nicolls would alert Ms. Stoos or Terry Hey, LMSW, when she was experiencing anxiety and panic attacks. AR 269, 276, 300, 303, 305, 306, 307, 336, 344, 347, 354, 370. Nicolls's family issues were a frequent subject of therapy and at one point Nicolls estimated that her family issues were at least half the cause of her anxiety. AR 344. When she began treatment in March 2007, Nicolls discussed caring for two young children with a third on the way. AR 320-21. She had just discovered that her husband was still married to his prior wife, and when they separated, he kept their child from Nicolls and threatened her. AR 320-21. Nicolls eventually got an annulment and custody of the child. AR 305. During treatment, Nicholls became pregnant with her fourth child. AR 269. Parenting was frequently discussed during therapy. Nicolls talked about her son's behavioral problems and often brought her children to therapy with her. AR 276, 278, 324, 344. Her therapist noted that the presence of her young children limited the topics they could discuss and it was later recommended that she attend therapy without her children. AR 309, 365. Nicolls also had difficulties with her mother and sister and her therapist noted the "toxic effects"

---

[1] The GAF is a numeric scale ranging from zero to one hundred and is used to rate social, occupational, and psychological functioning "on a hypothetical continuum of mental health-illness." *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 32-34 (4th ed. 2000) (DSM-IV). A GAF of 51-60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

they had on her and encouraged Nicolls to distance herself from them.  AR 284, 294, 324, 330, 334.  Nicolls's family issues persisted throughout her treatment and were frequently all that Nicolls wanted to discuss.  Ms. Hey noted that talking about family issues in therapy tended to get Nicolls off track to the point where they were not progressing towards Nicolls's goals for treatment.  AR 338, 365.

Nicholls was prescribed anti-depressants and anti-anxiety medication.  She started on Lexapro 10 mg on July 23, 2007.  At that time she was assessed a GAF score of 60.  AR 308.  At a follow-up appointment on August 1, 2007, Nicolls's mood and affect were anxious and her medication was increased to one and a half 10 mg tablets.  AR 306.  At her August 14, 2007 appointment, Nicolls reported she was having panic attacks two to three times per day that were brought on by little things.  She also described mood swings where she felt angry and irritable.  AR 303.  Ms. Stoos assessed a GAF score of 50 at that time.  She increased Lexapro to 20 mg, and started Nicolls on Ativan .5 mg on a per-needed basis.  AR 303.  At her next appointment with Ms. Stoos on September 4, 2007, Nicolls described having panic attacks at Promise Jobs classes.  She said approximately fifteen people were present, which made her feel uncomfortable.  AR 300.  Ms. Stoos suggested she take Ativan before the class or any appointment that would provoke anxiety and then an additional half tab a half-hour afterwards if she had not calmed down.  AR 300.

For the next six months, Nicolls's situation seemed to be improving.  She was assessed GAF scores of 55 on September 25, 2007, November 21, 2007, and January 31, 2008, with no change in her medication, and no reports of panic attacks or depression during her sessions through March 2008.  AR 297, 289, 282.  On April 1, 2008, Nicolls reported feeling depressed and panicky again.  AR 276.  During her next medication appointment with Ms. Stoos on April 29, Nicolls was assessed a GAF score of 60 and Ms. Stoos reduced the Lexapro to 10 mg because Nicolls was pregnant.  AR 273.  Nicolls had her fourth child on May 1, 2008.  AR 269.

Following her pregnancy, Nicolls continued experiencing panic attacks and depression, some of which was attributed to post-partum. AR 269. On July 1, 2008, Nicolls reported she was again having panic attacks and feeling depressed. She was assessed a GAF score of 50 and Ms. Stoos increased her Lexapro prescription to 20 mg. AR 269. During her therapy session on July 10, 2008, Nicolls reported her panic attacks and depression and said it was hard for her to get out of bed. AR 267. In August, Nicolls reported that things were improving but that she still had some panic attacks. Her GAF score was 50 at that time. AR 336. She was assessed a GAF score of 50 again on October 16, 2008. AR 326-27. Ms. Stoos decreased her Lexapro medication to 10 mg and prescribed Prestiq 50 mg. Nicolls's Pristiq medication was increased to 100 mg in January 2009 when she complained of continued panic attacks and maintained a GAF score of 50. AR 347-48. The next time she saw Ms. Stoos was in April 2009, and Nicolls complained that she was still having anxiety attacks during the day. AR 370. Ms. Stoos assessed a GAF score of 50 and started Nicolls on Trazodone 50 mg. At the end of June, Nicolls expressed feeling depressed and was not taking the Trazodone because her son would get up in the middle of the night and she needed to wake up. Ms. Stoos discontinued the Trazodone and added Abilify 2 mg one tab. AR 363-64. On September 9, 2009, Nicolls reported feeling depressed and irritable. Ms. Stoos increased the Abilify medication to 2 mg two tabs until Nicolls finished her supply and then to 5 mg 1 tab. AR 360-61.

### B. State Agency Medical Consultants

On October 1, 2007, Rhonda Lovell, Ph.D., a state agency medical consultant, completed a psychiatric review technique form (AR 226-39) in which she concluded that Nicolls's mental impairments of (a) depressive disorder not otherwise specified, (b) adjustment disorder with mixed anxiety and depression and (c) panic disorder without agoraphobia that needed to be ruled out caused her to experience mild restriction in activities of daily living ("ADLs"), moderate difficulties in maintaining social

functioning, moderate difficulties in maintaining concentration, persistence, or pace, but no episodes of decompensation of extended duration.  AR 229, 231, 236.  Dr. Lovell's assessment was based on all the evidence available in the record at that time, including medical records up to September 6, 2007.  AR 240-42.

Dr. Lovell also assessed Nicolls's mental residual functional capacity ("RFC") (AR 222-25) and concluded that she was moderately limited in her ability to (1) maintain attention and concentration for extended periods; (2) work in coordination with or proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; and (6) respond appropriately to changes in the work setting.  Nicolls otherwise was not significantly limited.  AR 222-23.

Dr. Lovell elaborated on her assessment of Nicolls's mental RFC:

> The claimant's allegations are programmatically insufficient for evaluation prior to 3/07 when she initiated treatment.  The claimant has not required psychiatric hospitalization.  At psychiatric evaluation on 7/23/07, the claimant presented with logical thought processes.  Concentration and memory were within normal limits.  Most recent GAF is estimated at 50. The claimant cares for young children, prepares meals, cleans, and does laundry.  She drives and shops for groceries, noting that she doesn't like to be in the store for longer than 10 to 20 minutes.  The claimant manages finances, does scrapbooking and interacts with family.

> The claimant appears to have a severe mental impairment that does not meet or equal a referenced listing.  Based on ADLs the claimant is able to understand and remember instructions and procedures for basic and detailed tasks.  Concentration is sufficient to carry out routine tasks.  The claimant's medical record and ADLs would indicate that she has the ability to interact on a time-limited, superficial basis with others. Treatment notes and ADLs suggest some moderate interruptions in her ability to regularly complete a typical work week.  This assessment is

consistent with the evidence of record.  No treating source statement was offered.

AR 224.

On reconsideration, another state agency consultant, Richard Kaspar, Ph.D., affirmed Dr. Lovell's assessment on February 7, 2008.  AR 244-61.


## C. Plaintiff's Testimony

The hearing before the ALJ was held on February 10, 2010.  Nicolls testified that she was 26 years old and had completed the 10th grade.  AR 32.  She stated she had tried to get her GED, but it was hard for her to sit in the classroom and she could not concentrate.  *Id.*  At the time of the hearing she had been married and divorced twice and had four children.  She had been living with her boyfriend for the past three years.  AR 33.  Nicolls testified that she had previously worked at a fast food restaurant for two and a half years and she had been a cashier at a grocery store.  AR 34.  She claimed her panic attacks began to get worse during her cashiering job and she quit because she was getting in trouble every day for not being able to concentrate on her work and complete tasks.  AR 34.

Nicolls then discussed her alleged mental impairments.  She testified that stepping outside to get the mail could send her into a panic attack.  AR 38.  During an attack she described feeling a tingly sensation and then her hearing and sight would start to go and she would become very dizzy.  AR 41.  Nicolls told the ALJ she began treatment at Siouxland Mental Health Center because she needed help with her anxiety and panic attacks that were "getting too out of control."  AR. 37.  The ALJ asked Nicolls why she missed several treatment appointments.  AR 37-38, 40.  Nicolls claimed there were days she did not want to get out of bed, but she did to take care of her children.  AR 37.  She also claimed that it was hard for her to get out of the house because of her panic attacks.  AR 41.  Despite missing therapy appointments, Nicolls said she kept up with her medications, but lately found them ineffective for controlling

her symptoms.  AR 38-39.  At the time of the hearing, Nicolls had not seen Ms. Stoos for four months.  AR 38.

Upon further questioning by her attorney, Nicolls stated that her panic attacks could last up to two hours, and she experienced these prolonged attacks once or twice a week.  AR 42.  She testified that she experienced six to seven smaller attacks every day that would usually last around twenty to thirty minutes.  *Id.*  When she has these panic attacks, Nicolls said the only thing she can do is sit down and breathe.  *Id.*  She said she had these attacks even when she was at home.  AR 43.

Nicolls also testified about her daily activities.  She said that she goes shopping for groceries with a friend and her children, but that she experiences a panic attack nearly every time.  AR 43-44.  Nicolls said she felt like she could not remember to complete tasks or even simple things such as taking out the trash on the day for pick up.  AR 45.  She also explained that she begins her day by feeding her children breakfast, and then has "art time" with them.  AR 46.  Nicolls testified that for the rest of her day she takes care of her children and cleans.  AR 46.

### D. Vocational Expert Testimony

The vocational expert identified Nicolls's past jobs as cashier and fast food worker and classified this work as light and unskilled.  AR 49-50.  The ALJ asked the VE to consider whether someone who needs to have unskilled work that does not require her to have to set goals, deal with job changes, or have extended concentration, and that includes only brief or superficial social interaction limited to occasional or no more than a third of the day could perform the work of a cashier.  AR 50.  The VE testified that the social interaction for a cashier would likely require more than a third of a day, but that the job of a fast food worker would fit this hypothetical.  *Id.*

The ALJ continued with a Step Five Analysis, and the VE identified other jobs such as a production assembler, hand packager, and housekeeping cleaner, that would be available under this hypothetical.  AR 52.  The ALJ also asked whether Nicolls

could retain any of her past jobs or other jobs identified by the VE based on her testimony. *Id.* The VE testified that the paranoia, fear, anxiety, and panic attacks Nicolls described would cumulatively prevent her from functioning at the identified jobs. AR 53. Next, Nicolls's attorney asked the VE if Nicolls could do her past work based on the moderate limitations identified by the state agency medical consultants. *Id.* These moderate limitations included maintaining attention, concentration for long periods, working with others without distraction, interacting with the public, accepting instruction and criticism, responding to changes, ability to complete a normal workweek without interruption from psychological symptoms, and ability to perform at a consistent pace. *Id.* The VE testified, "[A]t a moderate level, she would probably be able to do her past work, however, with all of those moderate things put together there would be . . . significant red flags. It would be difficult." *Id.* The VE clarified that it would be difficult for a person to sustain any kind of work with those moderate limitations. *Id.* Finally, the ALJ asked the VE to consider the RFC assessment completed by the state agency medical consultants and discuss whether it suggested the evaluator thought Nicolls could perform any of the identified jobs. The VE responded:

> I think it suggests that she can. His treatment notes and ADLs, or Activities of Daily Living suggests some moderate interruptions in her ability to regularly complete a typical workweek. I think . . . it indicates that she would have some difficulties due to those interruptions . . . but she would . . . I think basically what it's saying is she would be able to do them with . . . these interruptions . . . I think when a . . . doctor indicates moderate like that, I think they're saying that . . . they could probably do it but there would be, it would be difficult. There would be red flags and interruptions.

AR 54.

### *Summary of ALJ's Decision*

The ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through September 30, 2007.

(2) The claimant has not engaged in substantial gainful activity since July 23, 2007, the alleged onset date.

(3) The claimant has the following severe impairments: anxiety, panic disorder, depressive disorder and adjustment disorder and obesity.

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1.

(5) After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can perform routine repetitive unskilled work with an SVP of one or two that does not require extended concentration/attention or goal setting; social interaction should be brief and superficial, no more than one-third of the day.

(6) The claimant is capable of performing past relevant work as a fast food worker.  This work does not require the performance of work related activities precluded by the claimant's residual functional capacity.

(7) The claimant has not been under a disability as defined in the Social Security Act, from July 23, 2007, through the date of this decision.

AR 13-20.

In assessing the claimant's credibility, the ALJ noted several inconsistencies. First, the ALJ noted that although the claimant alleged severe panic attacks and the inability to leave the home, there were minimal treatment notes alleging severe panic attacks.  AR 16.  Second, the ALJ found that although the claimant alleged she was unable to work or attend appointments due to anxiety and panic attacks, her treatment notes indicated that her cancellations and no-show appointments had more to do with her boyfriend's calendar, transportation availability, and other appointments.  AR 16. Finally, the ALJ identified inconsistencies in the claimant's subjective allegations and her activities of daily living.  The ALJ concluded that Nicolls's "medically determinable impairments could reasonably be expected to cause the alleged symptoms;

however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment." AR 17.

The ALJ also considered a third party function report provided by Nicolls's mother, Elaine E. Marshal. AR 16-17. The ALJ considered Ms. Marshal's statements in that report that the claimant needed reminders to perform tasks, had difficulty concentrating, understanding, and following instructions, and that the claimant hated to be alone. *Id.* The ALJ ultimately found this report to be unreliable based on Ms. Marshal's relationship to the claimant and the ALJ concluded that she could not give significant weight to the report. *Id.*

The ALJ noted there the record contained no opinions from treating or examining physicians that would indicate the claimant was disabled or had greater limitations than the ones the ALJ had identified. The ALJ therefore gave "significant weight" to the state agency findings, because they were "consistent with the medical evidence when considered as a whole." AR 18.

### *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process

outlined in the regulations.  20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b).  These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.  If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.  20 C.F.R.

§§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R.

§§ 404.1520(a)(4)(v), 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).   At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The court will affirm the Commissioner's decision "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645.   The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).   The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010).   The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in

support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## Discussion

### A. Claimant's Credibility

Nicolls argues the ALJ failed to properly evaluate her subjective allegations under the *Polaski* factors. Specifically, she asserts that the ALJ did not analyze her claims of anxiety, paranoia, and difficulties in leaving the home, but simply dismissed Nicolls's symptoms because they were inconsistent with the RFC assessment. The Commissioner responds that the ALJ properly considered inconsistencies after

reviewing the entire record and these inconsistencies are supported by the record. The Commissioner emphasizes the ALJ's reasoning for discounting the claimant's credibility based on the objective medical evidence, Nicolls's failure to adhere to her recommended treatment schedule for reasons other than her disability, and Nicolls's extensive activities despite her claims of a disabling mental impairment.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Id.*

To determine a claimant's credibility, the ALJ must consider:

(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) any functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). "Other relevant factors include the claimant's relevant work history, and the absence of objective medical evidence to support the complaints." *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (quoting *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). An ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence, *Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010) rather such evidence is one factor that the ALJ may consider. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). The ALJ need not explicitly discuss each factor, as long as the ALJ acknowledges and considers the factors before discounting the claimant's subjective complaints. *Goff*, 421 F.3d at 791. If an ALJ discounts a claimant's subjective complaints, he or she is required to "detail the reasons for discrediting the

testimony and set forth the inconsistencies found." *Ford*, 518 F.3d at 982 (quoting *Lewis*, 353 F.3d at 647).

Here, the ALJ listed the *Polaski* factors before discussing Nicolls's subjective complaints.  The ALJ identified inconsistencies in Nicolls's testimony, her treatment records, and her activities of daily living.  First, the ALJ noted that although the claimant alleged severe panic attacks and the inability to leave the home, there were minimal treatment notes alleging severe panic attacks.  AR 16.  Second, the ALJ found that although the claimant alleged she was unable to work or attend appointments due to anxiety and panic attacks, her treatment notes indicated that her cancellations and no-show appointments had more to do with her boyfriend's calendar, transportation availability, and other appointments.  *Id.*  Finally, the ALJ identified inconsistencies in the claimant's subjective allegations and her activities of daily living.

The court finds that the ALJ's reasons for discounting Nicolls's subjective complaints are supported by substantial evidence.  First, the ALJ discounted Nicolls's allegations of severe panic attacks and inability to leave the home because there were minimal treatment notes alleging severe panic attacks.  AR 16.  "[A]n ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them."  *Goff*, 421 F.3d at 792 (quoting *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003)).  "However, '[t]he ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole.'"  *Id.* (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004)).

During the administrative hearing, Nicolls went into a detailed description of the panic attacks she experiences.  She claimed she had six to seven panic attacks every day that lasted for twenty to thirty minutes each.  She also claimed to have more severe attacks at least once or twice a week that would last for at least two hours.  AR 42.  Nicolls said she had these attacks regardless of whether she was at home or not.  AR 43.  The ALJ noted that the severity and extent of panic attacks as alleged by Nicolls was not apparent in the medical evidence.  AR 16.  Instead, the treatment notes

indicated that parenting and family issues concerning her ex-husband, mother, and sister were more frequently a topic of therapy. The lack of corroborating medical evidence was one factor the ALJ could rely on to determine the claimant's credibility. The ALJ examined other inconsistencies in the evidence as a whole to make her credibility determination.

The ALJ also examined Nicolls's failure to follow her recommended course of treatment. Nicolls alleged that she was unable to work or attend her appointments due to anxiety and panic attacks, but her treatment notes indicated that her cancellations and no-show appointments had more to do with her boyfriend's calendar, transportation availability, and other appointments. A failure to follow a recommended course of treatment weighs against a claimant's credibility. *Guilliams*, 393 F.3d at 802. Specifically, "[f]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). Before a claimant is denied benefits because of a failure to follow a prescribed course of treatment, an inquiry must be conducted into the circumstances surrounding the failure, and a determination must be made on the basis of evidence in the record whether the prescribed treatment would restore a claimant's ability to work or sufficiently improve her condition. *Burnside v. Apfel*, 223 F.3d 840, 844 (8th Cir. 2000). In determining whether an impairment is reasonably remediable, the question is whether it is reasonably remediable by the particular individual involved, given his or her social and psychological situation. *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984).

Nicolls acknowledged during the hearing that she had missed therapy twelve times in 2008 and ten times in 2009. AR 40-41. Nicolls's cancellation records since her alleged onset date indicate that she cancelled or was a no-show twelve times for no stated reason, eight times because of illness (her children's or her own), seven times for doctor's appointments or emergencies for her daughter or boyfriend, five times for transportation difficulties, and once for inclement weather. AR 266-367. There is also

evidence in the record that therapy, in addition to the medication, would improve Nicolls's condition.  On August 17, 2007, Ms. Hey indicated that Nicolls had "more capabilities than she realizes, and that her anxiety is quite treatable."  AR 302.  Her long term goals revised in August 2008 included building enough confidence so that Nicolls could work part time, shop, and deal with social situations calmly.  AR. 338.  These things suggest that the prescribed treatment would sufficiently improve her condition.  Therefore, the ALJ properly relied on Nicolls's failure to follow her prescribed course of treatment in deciding that Nicolls's subjective allegations were not entirely credible.

Finally, the ALJ considered Nicolls's activities of daily living.  Nicolls alleged that she experienced six to seven panic attacks per day lasting twenty to thirty minutes each.  She said the only thing she could do during one of these attacks was to sit down and breathe.  She claimed these panic attacks happened even when she was at home.  Nicolls also stated, in Function Reports she submitted with her application and during her testimony, that she cares for four young children, has "art time" with them in the morning, prepares meals and cleans the dishes, does laundry, cleans the house, shops at the grocery store, does scrapbooking and watches television in her spare time.  "'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'"  *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001)).  However, the Eighth Circuit has repeatedly stated that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."  *Hogg v. Shalala*, 45 F.3d 276, 278-79 (8th Cir. 1995) (citing *Harris v. Sec'y of Dep't of Health and Human Servs.*, 959 F.2d 723, 726 (8th Cir. 1992)).  A claimant need not prove she is bedridden or completely helpless to be found disabled.  *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).  With respect to activities of daily living, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others over a period of time

and the frequency, appropriateness, and independence of the activities." *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) (citing *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007)).

Nicolls's activities of daily living are not entirely inconsistent with her subjective allegations of disability. Most of the daily activities identified by Nicolls take place within the home. Nicolls testified, and her treatment notes indicate that being around people and in public is what triggers her anxiety and panic attacks, although she also claimed to have them when she was at home. The ALJ did not fully discredit Nicolls's subjective complaints based on these activities because she included significant limitations regarding social interaction in her RFC determination. *See Tindell v. Barnhart*, 444 F.3d 1002, 1006 (8th Cir. 2006) (upholding an ALJ's credibility determination, and noting that the ALJ did not fully discredit all of the claimant's complaints but included supported subjective limitations in the RFC assessment). This indicates that the ALJ appropriately considered Nicolls's activities of daily living amongst the other *Polaski* factors to properly determine the claimant's credibility regarding her anxiety and panic attacks.

The court finds that the ALJ properly evaluated Nicolls's subjective allegations using the *Polaski* factors. The ALJ provided valid and supported reasons for discounting the extent of Nicolls's allegations based on inconsistencies in the record as a whole, and thus the court will defer to the ALJ's credibility finding since it is supported by substantial evidence.

## B. RFC Determination

Nicolls also argues that the ALJ erred by failing to include all of the moderate limitations identified by the state agency consultant in the RFC finding, most notably the limitation that Nicolls would have "moderate interruptions in her ability to regularly complete a typical work week." AR 224. In addition, Nicolls asserts that the ALJ was required to explain why she excluded expert opinion evidence in making her RFC

determination.   The Commissioner argues that the ALJ properly included all credible limitations and that these limitations are supported by substantial evidence in the record.

The claimant's RFC is "what [the claimant] can still do" despite his or her "physical or mental limitations."   20 C.F.R. § 404.1545(a)(1).   "The ALJ must determine a claimant's RFC based on all of the relevant evidence."   *Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004).   This includes "an individual's own description of [her] limitations."   *McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).   The claimant's RFC "is a medical question," *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001), and must be supported by "some medical evidence."   *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam).   The medical evidence should address the claimant's "ability to function in the workplace."   *Lewis*, 353 F.3d at 646.

Here, the ALJ concluded that Nicolls had the RFC to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: she can perform routine repetitive unskilled work with an SVP of one or two that does not require extended concentration/attention or goal setting; social interaction should be brief and superficial, no more than one-third of the day.

AR 15.   As discussed above, the ALJ did not find the claimant's subjective allegations entirely credible, and instead gave significant weight to the state agency findings stating they were "consistent with the medical evidence when considered as a whole."   AR 18.

Because nonexamining sources have no examining or treating relationship with the claimant, the weight given to their opinions "depend[s] on the degree to which they provide supporting explanations for their opinions."   20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).   When evaluating a nonexamining source's opinion, the ALJ "evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources."   *Id.*   Here, state agency consultant, Rhonda Lovell Ph.D. performed the initial Mental Residual Functional Capacity Assessment and Psychiatric Review Technique on October 1,

2007.   AR 222-39.   Richard Kaspar, Ph.D., another state agency consultant, reconsidered Dr. Lovell's assessment on February 7, 2008 and affirmed it as written. AR 244-61. The record contains no opinion evidence from Nicolls's treating sources.

In Section I[2] of the Mental Residual Functional Capacity Assessment, Dr. Lovell found moderate limitations in Nicolls's ability to:

> maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting.

AR 222-23.   Dr. Lovell summarized her findings in Section III[3] as follows:

> The claimant's allegations are programmatically insufficient for evaluation prior to 3/07 when she initiated treatment.  The claimant has not required psychiatric hospitalization.   At psychiatric evaluation on 7/23/07, the claimant presented with logical thought processes.   Concentration and memory were within normal limits.  Most recent GAF is estimated at 50. The claimant cares for young children, prepares meals, cleans, and does laundry.  She drives and shops for groceries, noting that she doesn't like to be in the store for longer than 10 to 20 minutes.  The claimant manages finances, does scrapbooking and interacts with family.
>
> The claimant appears to have a severe mental impairment that does not meet or equal a referenced listing.  Based on ADLs the claimant is able to understand and remember instructions and procedures for basic and detailed tasks.  Concentration is sufficient to carry out routine tasks.  The claimant's medical record and ADLs would indicate that she has the

---

[2] Section I is "merely a worksheet to aid in deciding the presence and degree of functional limitations and adequacy of documentation and does not constitute the RFC assessment."  POMS DI 24510.060, *available at* https://secure.ssa.gov/poms.nsf/lnx/0424510060.

[3] Section III is the form's narrative section.  "It is in this section that the actual mental RFC assessment is recorded, explaining the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings."  POMS DI 24510.060, *available at* https://secure.ssa.gov/poms.nsf/lnx/0424510060.

ability to interact on a time-limited, superficial basis with others. Treatment notes and ADLs suggest some moderate interruptions in her ability to regularly complete a typical work week. This assessment is consistent with the evidence of record. No treating source statement was offered.

AR 224.

The ALJ is not required to mechanically list and reject every possible limitation. *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011). Furthermore, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). "The ALJ may reject the conclusions of any medical expert, whether hired by a claimant or by the government, if inconsistent with the medical record as a whole." *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995). The RFC must only include those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004).

The ALJ's RFC determination included all the limitations identified in the state agency medical consultants' RFC assessment except for "moderate interruptions in her ability to regularly complete a typical work week." AR 224. The only explanation provided by the state agency consultants for this limitation generally referenced the treatment notes and activities of daily living, but did not cite any specific evidence within those records. In making her RFC determination, the ALJ reviewed a much more extensive record than the state agency medical consultants did. When Dr. Lovell reviewed the medical record, it contained treatment notes only from April 1, 2004 to September 6, 2007. AR 240-42. Nicolls initiated treatment in March 2007 and her alleged disability onset date is July 23, 2007. Dr. Kaspar's review on reconsideration included additional treatment notes extending to December 27, 2007. AR 263-64.

Because the ALJ is required to evaluate nonexamining sources' opinions depending on the degree to which they consider all the pertinent evidence in the claim,

and the degree to which they provide supporting evidence to their opinions, the ALJ could properly leave out this limitation if the record supported such a determination. *See Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (finding that limitations identified by a nonexamining source did not have to be included if other evidence in the record did not support them).   Additionally, although the ALJ is required to describe the weight given to the opinions of state agency medical consultants, 20 C.F.R. § 404.1527(e)(2)(ii), and must provide good reasons for discounting a *treating* physician's opinion, *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007), nothing requires the ALJ to provide reasons for failing to adopt certain limitations identified by the state agency consultants as Nicolls suggests.   Failing to adopt all limitations also does not indicate that those limitations were not considered.   *Wildman*, 596 F.3d at 966.   Therefore, the ALJ did not err by failing to include every limitation identified by the state agency consultants.

## C. Hypothetical Question to the VE

Finally, Nicolls argues that the ALJ erred by failing to include all the impairments that were used to determine the claimant's RFC in the hypothetical question to the VE.   The Commissioner argues that the ALJ included the consultants' RFC assessment in the hypothetical questions and the ALJ was not required to include all of the moderate limitations identified by the consultant on the worksheet used to help determine the claimant's RFC.

The hypothetical question must only include impairments that are supported by the record and those that the ALJ accepts as valid.   *Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1015 (8th Cir. 2000)).   "The hypothetical question must capture the concrete consequences of the claimant's deficiencies."   *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)).   "If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise

inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." *Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998).

The VE was given several hypothetical questions during the administrative hearing. First, the ALJ asked if Nicolls could return to her past work based on the ALJ's RFC determination, which was unskilled work, SVP: 1 or 2 work that did not require her to have to set goals, deal with job changes, or have extended concentration, and with social interaction being restricted to brief or superficial, nothing more than occasional or a third of the day with co-workers, supervisors, and the general public. AR 50. The VE answered that only Nicolls's previous work in a fast food restaurant would fit this hypothetical. The ALJ then asked for a Step Five Analysis of what other jobs were available under this hypothetical. AR 50-52. The VE answered that work of a production assembler, hand packager, and housekeeping cleaner would be available. AR 51-52. Second, the ALJ asked whether Nicolls could perform her past work or the other jobs identified by the VE based on Nicolls's testimony. The VE answered that she could not. AR 53. Third, Nicolls's attorney listed the moderate limitations identified in Section I of Dr. Lovell's RFC assessment and asked the VE if Nicolls would be able to do her past work under those limitations. AR 53. The VE answered that "at a moderate level, she would probably be able to do her past work, however, with all of those moderate things put together there would be . . . significant red flags" and that "[i]t would be difficult." AR 53. When asked to clarify if Nicolls could sustain work under these conditions, the VE responded that it would be difficult to sustain any kind of work. AR 53. Finally, the VE was asked to read Section III of Dr. Lovell's RFC assessment and respond to whether the evaluator thought Nicolls could do any of the jobs identified by the VE. AR 54. The VE replied:

> I think it suggests that she can. His treatment notes and ADLs, or Activities of Daily Living suggests some moderate interruptions in her ability to regularly complete a typical workweek. I think, I think it indicates that she would have some difficulties due to these interruptions

that—but she would—I think basically what it's saying is she would be able to do them with, with these interruptions, would be—I, I think when a, when a doctor indicates moderate like that, I think they're saying that they, they could probably do it but there would be, it would be difficult. There would be red flags and interruptions.

AR 54.

All of Nicolls's possible limitations were included in at least one of these four hypotheticals, but the hypothetical question that the ALJ relied on to determine whether the claimant could do any of her past work under a Step Four analysis, or whether the claimant was able to do any other work under a Step Five analysis, only had to include impairments that were supported by the record and those that the ALJ accepted as valid.  It has already been determined that the ALJ's RFC determination included all of the valid impairments identified by the ALJ.  Because the ALJ's initial hypothetical asked the VE to consider Nicolls's ability to perform work based on this RFC determination and the VE concluded that Nicolls's could return to her past work as a fast food worker or other work as a production assembler, hand packager, or housekeeping cleaner, the hypothetical question was proper and constituted substantial evidence that Nicolls was not disabled.

### Conclusion

After a thorough review of the entire record and in accordance with the standard of review this court must follow, the court concludes that the ALJ's determination that Nicolls was not disabled within the meaning of the Act is supported by substantial evidence in the record.  Accordingly, the decision of the ALJ must be **affirmed** and judgment will be entered in favor of the Commissioner and against Nicolls.

**IT IS SO ORDERED.**

**DATED** this 12th day of July, 2012.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA